1

2

3

4

5

6                      IN THE UNITED STATES DISTRICT COURT

7

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   SAN FRANCISCO NAACP, *et al.*,                    No. C 78-01445 WHA
                                                      No. C 94-02418 WHA
10              Plaintiffs,

11      v.

12  SAN FRANCISCO UNIFIED SCHOOL                      **ORDER DENYING**
    DISTRICT, *et al.*,                               **PROPOSED EXTENSION**
13                                                    **OF CONSENT DECREE**
                Defendants
14  _____/

15  BRIAN HO, by his parent and next friend,
    CARL HO, *et al.*,
16
                Plaintiffs,
17
        v.
18
    SAN FRANCISCO UNIFIED SCHOOL
19  DISTRICT, *et al.*,

20              Defendants.
    _____/
21

22                            **INTRODUCTION**

23          A half-century ago, in the landmark decision *Brown v. Board of Education*, 347 U.S.

24  483 (1954), the Supreme Court called for an end to *de jure* school segregation.  Commenced in

25  1978, this class action accused the San Francisco Unified School District of *de jure* segregation.

26  Although this charge was never proven, a settlement in 1983 resulted in a consent decree.

27          For twenty-two years, the consent decree has regulated all public school assignments for

28  San Francisco's children.  At first, the decree resulted in better racial integration.  Later, as a

*(left margin, vertical text)* **United States District Court**  For the Northern District of California

**United States District Court**
For the Northern District of California

result of a different lawsuit challenging the decree, the parties agreed on a different method for student assignment, one that incorporated a system called the "diversity index." This proved to be a misnomer, for it has not achieved diversity in any meaningful sense. To the contrary, the student-assignment system imposed by the negotiated revision has allowed, if not fostered, resegregation in San Francisco schools.

Since the case was reassigned to the undersigned judge on January 11, 2002, the Court has repeatedly urged the parties to fix the so-called diversity index and substitute a system that will better achieve racial integration. While the parties have discussed alternatives, they have not come close to even proposing a solution. By its own terms (and by prior stipulation of all parties), the consent decree is scheduled to end on December 31, 2005, having previously been extended from December 31, 2002. Earlier this year, plaintiffs' counsel threatened to seek another extension (despite the stipulated termination date). The deadline for filing any such motion was set for August 25, 2005. In lieu of filing a motion, however, the parties submitted a compromise proposal to extend the decree by another eighteen months through June 30, 2007, a proposal that would, among other things, bar any revision to the student-assignment method for another year.

This proposal was the subject of a public hearing at which many San Francisco parents attended and were heard. It is clear that the present system imposes a burden on families. Their sacrifice has been in vain, for the diversity index has not and will not produce the benefit of diversity or racial integration. For this reason and other reasons now set forth, including the failure to prove up the legal prerequisites for prolonging the consent decree, this order **DENIES** the proposed eighteen-month extension. The consent decree will end, as earlier agreed, on December 31, 2005.

### STATEMENT

In 1978, the San Francisco branch of the National Association for the Advancement of Colored People ("SFNAACP") and a group of black parents filed this class-action lawsuit. They charged the San Francisco Unified School District, its board members and its superintendent, the California State Board of Education and its members, the State

**United States District Court**
For the Northern District of California

Superintendent of Public Instruction and the State Department of Education with engaging in racially discriminatory practices and maintaining a segregated school system in San Francisco, in violation of the constitutions and laws of the United States and California.  Plaintiffs sought a declaratory judgment and injunctions guaranteeing them equal educational opportunity and fully desegregated schools under a court-ordered desegregation plan.[1]  The action was assigned to the Honorable William H. Orrick, Jr., who presided over the case for almost all of its nearly thirty-year history.[2]

During a national era of widespread *de facto* segregation, if not *de jure* segregation, San Francisco faced a situation similar to that of many other large urban school districts:  Its schools were sharply divided along racial lines.  In 1970, 63 of 96 elementary schools were segregated.  At those schools, one racial group comprised over fifty percent of the school population at a time when the largest racial group — white students — comprised only 34 percent of the total elementary-school population.  There were 29 white schools, 23 black schools, four Hispanic schools and seven Chinese schools (Order Denying Plaintiffs' Motion for Partial Summary Judgment, June 30, 1981, at 11, 42–43).

Schools were also segregated according to faculty and administrators.  The racial and ethnic makeup of the district's teachers was consistently disproportionate to that of its students.  In 1970, although white students comprised only 35 percent of the district's total student population, white teachers comprised 79 percent of the district's teachers (*id.* at 58–60).  In

---

[1]  In truth, the history of this litigation arguably dates back even earlier, to another lawsuit filed in 1969. *Johnson v. San Francisco Unified Sch. Dist.*, 339 F. Supp. 1315 (N.D. Cal. 1971), *vacated and remanded*, 500 F.2d 349 (9th Cir. 1974).  The Ninth Circuit reversed the finding of *de jure* segregation, as intervening law had clarified the legal standard, and remanded to determine whether defendants possessed the requisite intent to segregate.  A second action, filed while the appeal was pending, was voluntarily dismissed in 1976. *O'Neil v. San Francisco Unified Sch. Dist.*, No. C-72-0808 RFP (N.D. Cal. filed May 5, 1972).  Because the *Johnson* plaintiffs made no effort to prove *de jure* segregation on remand, on June 22, 1978, the court *sua sponte* dismissed that complaint without prejudice, for mootness and failure to prosecute.

[2]  No summary of this litigation would be complete without recognizing the judge who presided over this case for much of its history.  From 1978 until his retirement in 2002, the late Judge William Orrick oversaw both the original *SFNAACP* litigation and the implementation of the consent decree.  Under his vigilant watch, the case resulted in a successful settlement and consent decree, and the San Francisco schools became integrated.  Years later, he also presided over the related action involving the *Ho* plaintiffs.  In his last year on the bench, Judge Orrick acquiesced in the 2001 settlement in these actions (and amendments thereto), which resulted in the current student-assignment plan.

1    1965, more than 73 percent of the district's regular schools had no black teachers (*id.* at 60).

2    Most black teachers were assigned to predominantly black schools, where teachers tended to be

3    less experienced and paid lower salaries (*id.* at 60–61).  A similar pattern of segregation applied

4    to school administrators.  In 1965, there were only two nonwhite administrators in the entire

5    district.  The only black principal was assigned to Bret Harte, a school 77 percent black.  The

6    only Chinese principal was assigned to Spring Valley, a school 91 percent Chinese (*id.* at 64).

7    **1.    LITIGATION LEADING TO THE 1983 CONSENT DECREE.**

8    In the five years following the filing of the complaint, the parties litigated various issues.

9    On September 18, 1979, the state defendants' motion for dismissal or abstention was denied.

10   Judge Orrick rejected defendants' arguments that:  (1) the Court should not decide the

11   "unsettled" issue of state law concerning the apportionment of policy-making powers between

12   state and local authorities, and (2) primary responsibility for implementing education policy

13   should rest with the state legislature and local school districts, not with defendant state

14   agencies.

15   Because proof of segregative intent was a predicate for demonstrating a violation of

16   equal protection, this issue was also litigated.  *See*, *e.g.*, *Personnel Adm'r of Mass. v. Feeney*,

17   442 U.S. 256, 279 (1979).  To establish segregative intent, plaintiffs needed to demonstrate

18   evidence of past purposeful discrimination that would then give rise to liability for subsequent

19   acts which had the effect of maintaining a segregated school system.  Absent such a showing,

20   plaintiffs needed to demonstrate ongoing intentional segregation, a higher burden.

21   On September 24, 1981, the Court denied the school district's motion for a separate trial

22   on the issue of whether, at the time of filing of the original complaint, it was operating a

23   segregated school system.  While that motion was still pending, on June 30, 1981, the Court

24   denied plaintiffs' motion for partial summary judgment on the issue of whether, as of 1954 and

25   1970, the district was intentionally racially segregated.

26   These two motions sharpened the issues for trial and highlighted the factual strengths

27   and weaknesses of plaintiffs' case.  For example, plaintiffs had stronger evidence on racial

28   disparities in faculty and administrative hiring but lacked evidence concerning discrimination

United States District Court

For the Northern District of California

1    against minority groups other than blacks.  As a result, the parties entered into settlement

2    negotiations, drawing on the expertise of a Court-appointed settlement team co-chaired by

3    Professor Harold Howe II and Professor Gary Orfield, two of the most well-reputed educators

4    in the country; both had extensive experience in desegregation cases.  The parties submitted a

5    consent decree on December 30, 1982.  After a fairness hearing held on February 14, 1983, the

6    Court approved the consent decree by written decision on May 20, 1983.  *San Francisco*

7    *NAACP v. San Francisco Unified Sch. Dist.*, 576 F. Supp. 34 (N.D. Cal. 1983).

8          The goal of the decree was "to eliminate racial/ethnic segregation or identifiability in

9    any District school program or class and to achieve throughout the system the broadest

10   practicable distribution of students from nine racial and ethnic groups."  *Id.* at 37; Consent

11   Decree ("CD") ¶ 12.  Guidelines were adopted to prevent any racial/ethnic group from

12   exceeding 45 percent of the student body at any regular school or 40 percent at any

13   "alternative" school (CD ¶ 13).  All schools and all grades (K–12) were covered.  The decree

14   further designated nineteen historically segregated schools for special desegregation treatment

15   and identified certain schools in Bayview-Hunter's Point for reconstitution and conversion into

16   magnet schools (CD ¶¶ 14, 17).[3]

17         Many of the policies and practices alleged to have contributed to a racially segregated

18   school system were also addressed.  For example, the decree provided that each school's staff

19   should reflect the district-wide racial/ethnic composition of students and that staff would be

20   equitably assigned throughout the district (CD ¶¶ 34–35).  The parties were also required to

21   report to the Court on the fairness and consistency of disciplinary actions (CD ¶ 38).

22         Finally, the decree stated that "the overall goal of this Consent Decree will require

23   continued and accelerated efforts to achieve academic excellence" and required monitoring of

24   _____

25         [3]  "Reconstitution" is a drastic method of educational reform whereby an existing school is recreated
     from scratch.  While the building and the students remain the same, the entire faculty and administration are
26   replaced with a new staff.  Reconstitution in San Francisco also involved (i) the adoption of eleven
     "Philosophical Tenets" to establish expectations for learning and behavior; (ii) determination of specific student
27   outcomes for each grade; (iii) advancement of available instructional technology; (iv) increases in adult-student
     ratios; (v) increases in staff development to implement these components; (vi) selection by staff of effective,
28   unique instructional tools; and (vii) encouragement of parental involvement.  *See* Kelly C. Rozmus, *Education
     Reform and Education Quality:  Is Reconstitution the Answer?*, 1998 B.Y.U. Educ. & L.J. 103, 113–14 (1998).

**United States District Court**
For the Northern District of California

1   student academic progress in an annual report (CD ¶¶ 39–40).  Other highlights of the decree

2   included a requirement that both the school district and an independent reviewer (subsequently

3   known as the "consent-decree monitor") submit an annual report regarding the district's

4   compliance with the consent decree and a provision that the state would pay the costs of

5   complying with the decree (CD ¶¶ 44–45).

6       **2.**      **RESULTS OF THE 1983 CONSENT DECREE.**

7       Implementation of the consent decree proceeded successfully, with the exception of a

8   dispute over exactly how much the state was required to reimburse the district for the costs of

9   implementation.  *See San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 695 F. Supp.

10  1033 (N.D. Cal. 1988), *rev'd*, 896 F.2d 412 (9th Cir. 1990).  After eight years of

11  implementation, the Court commissioned a comprehensive report on the results of the consent

12  decree, appointing Professor Orfield to lead the investigation team.  This committee of experts

13  filed its report in June 1992, finding that the district had "largely achieved the Decree's

14  desegregation goals," while also noting the continuing achievement gap for black and Hispanic

15  students.  *Desegregation and Educational Change in San Francisco, Findings and*

16  *Recommendations on Consent Decree Implementation* 1 (1992).

17      Based on recommendations made in the report, the Court approved a modified consent

18  decree on November 5, 1993 (hereinafter "CD II").  The modified decree left the basic structure

19  of racial/ethnic distribution the same but incorporated changes in individual school treatment

20  (CD II at ¶¶ 15–16).  The district was also required to provide an additional annual report

21  showing the longitudinal impact of the consent decree (CD II ¶ 40).[4]  At the fairness hearing,

22  motions to intervene were heard from Multicultural Education, Training, and Advocacy, Inc.,

23  representing the interests of both Latino and Chinese students, and the local teachers union.  On

24  July 22, 1993, the Court denied the motions to intervene while permitting two coalitions,

25  representing the interests of Latino and Chinese students respectively, to act as amici curiae.

26      The goal of the consent decree was to promote desegregation.  In doing so, it intended to

27  improve the quality of education all students received by equalizing access, furthering diversity

28

---

[4]   The longitudinal reports tracked the progress of the same students over time for each targeted school.

United States District Court

For the Northern District of California

1 and giving effect to every child's right to equal educational opportunity under *Brown v. Board*

2 *of Education*.  For a period of time, this goal was realized.  The consent decree succeeded in

3 promoting integration and academic excellence throughout the district.  Between 1983 and

4 1997, fifteen schools were reconstituted, five new schools were established and one school was

5 closed (Stuart Biegel, *Report 17 of the Consent Decree Monitoring Team* 9 (1999–2000)

6 [hereinafter "Biegel Report No. 17"]).  At the apex of integration, during the 1997–98 academic

7 year, only thirty regular district schools and six alternative schools (out of 122 schools total)

8 were out of compliance with the 45/40 percent requirement, and only one school enrolled more

9 than fifty percent of a single race/ethnicity.  In addition, standardized test scores increased

10 seven years in a row between 1992 and 1999.  Reading scores increased for students of every

11 race and ethnicity, with the exception of a slight drop for Korean students; math scores also

12 increased for students of every race and ethnicity, with the exception of a slight drop for Native

13 American students (Biegel Report No. 16 (1998–99) at 45, 116).

14     **3.**    **THE *HO* ACTION.**

15        Notwithstanding this success, some members of the San Francisco community were not

16 pleased with the results of the 1983 consent decree, particularly the requirement that student

17 assignment to schools adhere to a certain racial/ethnic distribution.  After 1983, the

18 demographics of the district changed significantly.  Enrollment of black and white students

19 declined as Chinese-American and Latino enrollment grew.  While Chinese-American students

20 represented 19.5 percent of the district in 1983, by 1992 they had grown to 24 percent, the

21 largest ethnic subgroup in the district.[5]  The practical implication of this demographic trend was

22 that Chinese-American students were bumping up against the 45/40 percent enrollment ceilings

23 set by the 1983 consent decree, especially at the city's most desirable public schools.  At

24 Lowell, the district's renowned academically-selective, alternative high school, for example,

25

26     [5]  These demographic trends continue to the present day.  The Chinese-American student population has increased from 19.5 percent in 1983 to 32.1 percent in 2005 and the Latino student population has increased from 17.2 percent in 1983 to 21.6 percent in 2005.  In contrast, the black student population has declined from 23.1 percent to 13.7 percent during this time, and the white population has declined from 16.9 percent to 9.3 percent.  Numbers for other racial and ethnic groups have remained relatively stable since 1983 (Biegel Report No. 22 (2004–05) App. 2 at 2).

United States District Court

For the Northern District of California

1   Chinese-American students needed a significantly higher admission index score to gain

2   admission than did white, black or Latino students.

3          On July 11, 1994, several schoolchildren of Chinese descent filed suit against the district

4   and state defendants.  The plaintiffs in *Ho v. San Francisco Unified School District*, a Lowell

5   applicant as well as two elementary school children who had been "capped out" of their

6   neighborhood schools, alleged that the student-assignment plan described in Paragraph 13 of

7   the consent decree — the 45/40 percent ethnic distribution requirement — constituted race

8   discrimination in violation of the Equal Protection Clause.  In January 1995, the *Ho* plaintiffs

9   filed a first amended complaint adding the SFNAACP as a defendant.  In March 1996, the Court

10  certified a class comprised of San Francisco schoolchildren of Chinese descent.

11         The *Ho* plaintiffs then filed a motion for summary judgment, arguing that the

12  ethnic-distribution requirement of Paragraph 13 was unconstitutional in 1983 and remained so.

13  In the alternative, they argued that because the district had already complied for fourteen years,

14  the decree was no longer necessary and should be dissolved.  In May 1997, the motion for

15  summary judgment was denied.  The Court held that the decree was not unconstitutional when

16  entered and that, in any event, res judicata barred the plaintiffs — as members of the original

17  class — from raising the issue.  *Ho v. San Francisco Unified Sch. Dist.*, 965 F. Supp. 1316,

18  1320 (N.D. Cal. 1997).  The Court also held that there were issues of fact precluding summary

19  judgment, at least as to:  (1) the existence of past discrimination justifying the consent decree;

20  (2) the necessity of Paragraph 13 as a sufficiently narrowly-tailored remedy; and (3) whether

21  continued judicial supervision was necessary to achieve full compliance with the decree.  *Id.* at

22  1324–25, 1327.

23         The *Ho* plaintiffs appealed the summary-judgment ruling.  They also sought a writ of

24  mandamus directing the Court not to proceed with trial.  In an opinion by Judge John Noonan

25  filed on June 4, 1998, the Ninth Circuit dismissed the appeal for lack of jurisdiction.  It noted

26  that "proper resolution of any desegregation case turns on a careful assessment of its *facts*,"

27  which had not yet been presented.  *Ho v. San Francisco Unified Sch. Dist.*, 147 F.3d 854, 860

28  (9th Cir. 1998) (emphasis in original).  The court also denied the petition for a writ of

8

mandamus, while nevertheless pointing out weaknesses in the evidence justifying the continued implementation of Paragraph 13. After a lengthy discussion of the history of racial discrimination against the Chinese in San Francisco, Judge Noonan identified the two issues that remained for trial: "Do vestiges remain of the racism that justified Paragraph 13 of the consent decree in 1983? Is Paragraph 13 necessary to remove the vestiges if they do remain?" *Id.* at 865. The Ninth Circuit stressed that defendants' evidence must tie the current vestiges of segregation to the discriminating practices and policies that justified the adoption of the consent decree in 1983. It also held that it was defendants' burden "to demonstrate that Paragraph 13 is still a remedy fitted to a wrong — to show that the racial classifications and quotas employed by Paragraph 13 are tailored to the problems caused by vestiges of the earlier segregation." *Ibid.*

On December 10, 1998, the Court denied the *Ho* plaintiffs' motion for a preliminary injunction. That motion sought to enjoin defendants from further implementation of the student-assignment plan described in Paragraph 13. The Court found that plaintiffs had not shown irreparable harm. If they succeeded at trial, there would be ample time to assign students to schools in a race-neutral manner for the following school year.

### A.    The 1999 Settlement.

On February 16, 1999, the first day of trial, the parties submitted a settlement agreement, which was later approved in an order filed July 2, 1999. Therein, Judge Orrick expressly noted that the *Ho* "[p]laintiffs were likely to succeed on their claim that the race-based student-assignment plan is no longer constitutional" because defendants were unlikely to be able to meet the burden of "proving that vestiges still exist of the discriminatory policies and practices that justified the Consent Decree in 1983, and that the race-based student-assignment plan in the Consent Decree is necessary to address the problems caused by the vestiges of the earlier segregation." *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1029 (N.D. Cal. 1999).

The central feature of the *Ho* settlement was a modification of Paragraph 13 to allow the creation of a new student-assignment plan that eliminated race as a factor in determining student placement. The Court further required the parties to respond to reports submitted

1   pursuant to Paragraph 44 of the original 1983 consent decree, which mandated an annual

2   independent review of the district's progress.  *Id.* at 1039.  Specifically, the parties were

3   required to address issues raised in those reports by members of the consent-decree advisory

4   committee (represented at hearings by Hoover Liddell) and consent-decree monitor Stuart

5   Biegel.[6]

6          The *Ho* settlement agreement also set a termination date for the consent decree of

7   December 31, 2002, subject to Court approval (¶ A); provided for the modification of

8   Paragraph 12a, so that the district could request, but not require, parents and/or students to

9   identify themselves by race at the time of enrollment (¶ D); and stipulated that the parties must

10  meet to discuss additional modifications to Paragraph 13 if the new student-assignment plan

11  resulted in an identifiable racial/ethnic concentration at any particular school (¶ G).  On

12  August 11, 1999, the consent decree was amended to include the terms of the *Ho* settlement

13  (hereinafter "CD III").

14         During 1999–2001, the reports submitted by the advisory committee and Mr. Biegel

15  reflected continuing problems within the school district and failure to comply with certain terms

16  of the decree, including the development of a race-neutral student-assignment plan (see CD III

17  ¶ 13).  The district was ordered to file a comprehensive plan to address these problems, which it

18  did on April 11, 2001.  The plan was titled "Excellence for All:  A Five-Year Comprehensive

19  Plan to Achieve Educational Equity in the San Francisco Unified School District for School

20  Years 2001–02 through 2005–06."  At the parties' request, Thomas J. Klitgaard was appointed

21  as special master to assist the parties in resolving any disputes.

22                    **B.      The 2001 Settlement.**

23         On July 11, 2001, the parties submitted an amended stipulated settlement agreement,

24  which was incorporated into the current version of the decree (hereinafter "CD IV").  These

25  changes included further amendments and extended the life of the decree to December 31, 2005,

26

27         [6] The consent-decree advisory committee was appointed by the Court in 1993 to "provid[e] a neutral
    forum for discussion of suggestions of the State's monitor and advis[e] the Court from an educational policy
28  perspective on the progress towards achieving the Consent Decree goals."  *See San Francisco NAACP v.
    San Francisco Unified Sch. Dist.*, 1993 WL 299365 at *2 (N.D. Cal. 1993).

with state funding to continue until June 30, 2006, in order to "facilitate an orderly transition" (CD IV ¶ 48-1).  This extension was allegedly necessary due to "unexpected turmoil" in the district.  This included the sudden resignation of Superintendent Waldemar Rojas (after which the school district was left without a leader for over a year) and widely-publicized financial mismanagement.  The amended settlement expressly stated that by December 31, 2005, the district "shall have taken all practicable steps" to eliminate any vestiges of *de jure* discrimination, thereby specifically incorporating the legal standard for terminating desegregation consent decrees.  *See Bd. of Educ. of Oklahoma City Pub. Schs. v. Dowell,* 498 U.S. 237 (1991); *Freeman v. Pitts*, 503 U.S. 467 (1992).

As part of the 2001 settlement, the district agreed to adopt and comply with a system of monitoring and review of consent decree budgets and programs.  More importantly, the settlement resulted in a new student-assignment provision laid out in Paragraph 13 of the decree to fulfill the mandate of the 1999 settlement.  As agreed, race/ethnicity could no longer be used as a factor in student assignment (CD IV ¶ 13(j)).[7]  Instead, the district would assign students to schools based on:  (1) where siblings have been assigned; (2) whether any specialized learning needs must be accommodated; and (3) a "diversity index" taking into account socioeconomic status, academic achievement, English-language learner status, mother's educational background, academic performance at the student's prior school, home language and geographic areas (CD IV ¶ 13(k), incorporating Attachment B).[8]  A separate plan that was consistent with Paragraph 13(j) would be developed for Lowell High School and School of the

---

[7]  The Ninth Circuit has recently held that the use of a race-based "tie-breaker" in a student-assignment system used by Seattle public schools does not violate the Equal Protection Clause.  *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, ___ F.3d ___, 2005 WL 2679585, No.  01-35450 (9th Cir. Oct. 20, 2005) (en banc).  In theory, a similar student-assignment system could be implemented in San Francisco.  If the consent decree were extended, however, the terms of the *Ho* settlement would prevent the school district from using race or ethnicity as a factor at all, even as a tie-breaker.  Also, the proposed extension would not allow any changes to the student-assignment system before the 2007–08 school year.

[8]  Attachment B stated that "the District will be proposing by August 15, 2001, in accordance with the terms of the Stipulation, diversity index criteria related to 'Geographic Areas'" (Amended Stipulation and Order Re Modification and Termination of Consent Decree, Attachment B, n.1, July 12, 2001).  In a Joint Stipulation dated December 4, 2002, the school district agreed to consider using geographic zones and state its conclusions by August 15, 2003.  The NAACP disputed the district's compliance with this promise, but no contempt or compliance motion was ever filed by plaintiffs or anyone else.  To this date, the diversity index still does not take into account "Geographic Areas."  *See SFUSD Enrollment Guide for 2005–2006 Enrollment Period* at 16.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  Arts.  Paragraph 13(m) was amended to set forth a procedure for addressing any identifiable

2  racial or ethnic concentration at a particular school that the parties believed adversely affected

3  the district's goals, although no party could propose a change to the student-assignment

4  procedure until the 2004–05 school year.

5          **4.      RESULTS OF THE 1999/2001 SETTLEMENTS.**

6          With the adoption of the student-assignment method which arose from the 1999 and

7  2001 settlements, the district has become increasingly resegregated.  A dramatic achievement

8  gap has persisted for many black and Latino students.  During the 2001–02 school year, thirty

9  schools were severely resegregated at one or more grade levels.[9]  By the 2004–05 school year,

10  this number had risen to 43, with 27 schools entirely resegregated (Biegel Suppl. Report

11  (April 2005) App. 1).

12          To put these numbers in perspective, it is useful to recall that in 1970, over fifty percent

13  of San Francisco schools were segregated, defined as one racial/ethnic group comprising over

14  fifty percent of the school population.  By 1997–98, the most successful school year after the

15  1983 consent decree, only one school — or 0.8 percent of San Francisco schools — enrolled

16  more than fifty percent of a single racial/ethnic group.  Six years later, this number has climbed

17  back up to 35 percent.  Today, over one in three San Francisco public schools is resegregated,

18  largely as a result of the student-assignment system adopted by the parties and written into the

19  consent decree.

20          Academic achievement data indicate a close relationship between resegregation and the

21  disparity in academic achievement between black and Latino students in comparison with white

22  and Chinese-American students.  The overwhelming majority of schools that have been

23  successful in closing the achievement gap, as indicated by the large percentages of students of

24  all ethnic backgrounds who score at the proficient or above level on state standardized tests,

25  have maintained ethnically and racially-diverse student bodies (Biegel Report No. 22 (2004–05)

26  App. 1 at 2).  In contrast, the Academic Performance Index (API), a school-ranking system

27

28          [9] "Severely resegregated" was defined as sixty percent of the student population of a single
race/ethnicity.

United States District Court

For the Northern District of California

based on standardized test scores, indicates that schools with declining APIs are those that have become resegregated.  For example, all of the elementary schools in Bayview-Hunter's Point that have a predominantly black enrollment, except for Carver, are now at an API of 1, the lowest possible ranking (Biegel Suppl. Report (April 2005) at 18).

Resegregated schools also have the most significant achievement gaps.  For example, at Visitacion Valley Middle School, out of 113 black students, only nine scored at the proficient level on the state standardized test for English/Language Arts and only two did the same for math; out of 87 Latino students, only five scored at the proficient level for English/Language Arts and only six for Math (Biegel Suppl. Report (April 2005) App. at 9–10).  In addition to standardized test scores, the consent-decree monitoring team has identified numerous other indicators of the dramatic achievement gap among students of different racial and ethnic groups, including the disparity in grade-point averages by school and by ethnicity; the disparity in attendance rates by school and by ethnicity; the number of Advanced Placement classes offered at various district high schools and the ethnic makeup of students in those classes; the number of special-education students at various schools and the ethnic makeup of those students; and the number of suspensions and expulsions by ethnicity.  To take but one example, in 2004–05, African-American students comprised 13.7 percent of the student population yet received 51.69 percent of all suspensions (Biegel Report No. 22 App. 2 at 23).

It should be noted that despite this broad and disheartening story of resegregation, there has also been some slivers of progress towards the original goals of the 1983 consent decree.  For example, the most recent report from Mr. Biegel highlighted thirteen schools that exemplified the most successful reforms under the consent decree (*id.* at 5–7).

**5.      RECENT HISTORY.**

Both the consent-decree monitor and the school district have done an admirable job of documenting the consequences of the decree.  With this information in hand, the parties have met regularly to respond to new reports and to discuss the shortcomings revealed therein.  Yet, although the parties have appeared at numerous status conferences, since the modifications to

13

United States District Court

For the Northern District of California

1    the student-assignment plan made in 2001, no substantive motions have been filed to change the

2    diversity index.

3         The consent-decree monitor has made clear his view that the current student-assignment

4    plan, incorporated into the consent decree itself, has resulted in the resegregation of certain

5    schools.  He has repeatedly recommended that geographic zones be taken into account as one

6    factor in placing students, presumably to counteract the effects of *de facto* residential

7    segregation in San Francisco.[10]  Pursuant to Paragraph 13, beginning with the 2004–05 school

8    year, the parties could meet and confer to address any concerns regarding ethnic concentration

9    at any school and modifications to the assignment plan.  Yet, while the parties have discussed

10   the use of geography as a criterion for placement, and the district has agreed to consider this

11   change, no party has filed a motion to compel a fix.

12        In response to a supplemental report submitted by the consent-decree monitor on

13   March 12, 2004, describing at length the district's achievement gap and its relation to

14   resegregation, the Court, on its own initiative, called for an evidentiary hearing.  This was held

15   on August 3, 2004.  Dr. William Trent, Professor of Education Policy at the University of

16   Illinois, Urbana-Champaign, testified regarding the correlation between the racial concentration

17   of schools and students' academic performance.  He testified that, regardless of race/ethnicity,

18   students in schools that are not racially identifiable do better than students in primarily Latino

19   or primarily African-American schools.  Ms. Orla O'Keeffe, director of the district's

20   Educational Placement Center, also testified about how the diversity index functioned to assign

21   students to over-subscribed schools, based on the six factors described above.[11]  Yet, a

22   completely random assignment of students might have been more successful in achieving

23   district-wide diversity.  The Court set a deadline of September 2, 2004, for any motion to

---

24        [10]  While this admittedly would not be aimed at remedying *de jure* segregation, "in a consent decree, defendants may agree, within limits, to do more than a judicially imposed injunction could have required."
25   *Alexander v. Britt*, 89 F.3d 194, 200 (4th Cir. 1996).

26        [11]  Ms. O'Keeffe testified that a profile for each student is created by assigning a "1" or "0" for each of six binary factors:  socioeconomic status, academic achievement status, mother's educational background,
27   language status, academic performance index and home language.  The diversity score for each factor is calculated as the sum of the squared proportions of "1s" and "0s" subtracted from one; the optimal score,
28   representing perfect diversity, would be "0.5."  The composite diversity score is calculated by averaging the diversity scores for each of the six factors.

United States District Court
For the Northern District of California

1   modify the plan.  The parties met and conferred a number of times during the month of August,

2   but no one came forward with a motion to modify the student-assignment plan.  The same

3   discredited diversity index was left in place.

4         Instead, the school district — with the consent of all parties and leadership from

5   Superintendent Arlene Ackerman (who has recently announced her resignation effective

6   June 30, 2006) — implemented the "Dream Schools" initiative, also known as Dramatic

7   Accelerated Educational Reform, starting in 2004.  Through this educational-reform measure,

8   the district reconstituted three of its lowest performing and most ethnically isolated schools

9   located in Bayview/Hunter's Point during the 2004–05 school year.  It also implemented a new

10  standards-based model of instruction with additional academic support for students.  The parties

11  agreed that the Dream Schools initiative was a way to close the achievement gap.  The school

12  district targeted seven other schools for conversion.  In an order dated October 18, 2004, the

13  Court granted a joint request to amend the decree and compel the school district to take all

14  necessary steps to implement those seven additional Dream Schools in time for the 2005–06

15  school year.

16        The local teachers union has challenged the reconstitution aspect of the Dream Schools

17  initiative, which requires all teachers at schools designated for conversion to reapply for their

18  jobs.  This related action was removed from state court and is now pending.  *United Educators*

19  *of San Francisco v. San Francisco Unified Sch. Dist.*, No. C 05-02828 WHA (N.D. Cal.

20  removed July 12, 2005).

21        **6.     PROPOSED EXTENSION OF THE CONSENT DECREE.**

22        As stated, all agreed that the decree would end on December 31 of this year.  Now,

23  however, counsel wish to extend the termination date another eighteen months.  The proposal

24  includes no fix to the diversity index or the student-assignment plan.  To the contrary, under the

25  compromise proposal, the procedure for making any adjustments to the student-assignment

26  system could not even be invoked before October 15, 2006, meaning that the current

27  student-assignment system would be locked in for yet another year.  The proposal to extend the

28  consent decree is summarized as follows:

**United States District Court**
For the Northern District of California

(1)     By October 1, 2005, the school district shall identify at least three additional schools (aside from the seven schools named in the order of October 18, 2004) selected from the list of underperforming schools, for conversion to Dream Schools during the 2006–07 school year. Specific plans for these Dream Schools shall be developed and implemented according to the expectations and operational guiding principles agreed to by the parties.

(2)     The two experts who are evaluating the student-assignment method shall consult with the parties, other experts, the Superintendent's Community Advisory Committee On Student Assignment and the State Monitor by November 30, 2005; any recommendations for proposed changes shall be made by January 2006. Public comment must be sought by April 2006.

(3)     Any student-assignment method or revisions to the current method for the 2006–07 and 2007–08 school years must comply with Paragraphs 13(j) and 13(m) (ii) of the consent decree, unless written notification of proposed changes for the 2007–08 school year and reasons for such changes (*i.e.*, recommendations of experts) are provided by January 31, 2006. If Court approval is required, any proposed changes must be submitted to the Court by May 31, 2006.

(4)     By October 15, 2005 and October 15, 2006, the school district shall make available information concerning the racial or ethnic composition of each school within the district, but no party may invoke the procedures for adjustments to the assignment method earlier than October 15, 2006.

(5)     The school district shall include the following disclaimer language in any brochures or catalogs, as well as on its website:

   The student assignment method currently used by the SFUSD was developed and adopted by the SFUSD; the decision to use this

1   assignment method was not taken at the demand of any party in the
desegregation consent decree lawsuits.  The student assignment
2   method was approved by the Court in its October 24, 2001 Order.[12]

3   (6)   The consent decree shall terminate as of June 30, 2007, without the

4   necessity of further order of the Court.  The parties agree that by that

5   date, the SFUSD shall have taken all practicable actions to achieve

6   unitary status, including eliminating any vestiges of past *de jure*

7   segregation or ethnic discrimination to the extent practicable and

8   complied with the consent decree substantially and in good faith for a

9   reasonable period.  The parties expressly agree not to seek any further

10   extension of the consent decree beyond this date, by motion or

11   otherwise.

12   Public comments were solicited and compiled by counsel for the Court's review.  The

13   public response to the proposed extension of the consent decree was overwhelmingly negative.

14   Although the parties appear to tabulate the results differently in their reply briefs, this order will

15   use the district's own numbers by way of example.  Of 252 public comments, 213 generally

16   opposed the settlement, 28 supported it, two supported it with suggested amendments and eleven

17   failed to indicate the author's position on the issue.

18   At the hearing, many members of the public voiced their concerns, including parents,

19   students, teachers and leaders of various local organizations.  When pressed, many of those

20   individuals in favor of extending the decree appeared to be arguing for the implementation of the

21   Dream Schools initiative (or other improvements for underperforming schools), not necessarily

22   for the decree itself or the Court's continued involvement.  Some advocated an extension of the

23   decree, but with amendments to fix or replace the diversity index.  Other parents argued that the

24   decree should be allowed to expire so the school board would be free to devise a new

25   student-assignment plan unencumbered by the diversity-index method.  Parents against the

26   current student-assignment system also stressed the burden of having their children spending

27   hours on buses commuting to schools across town, instead of in classrooms or at home with their

28   _____

[12] This language has been modified to read:  ". . . the decision to use this assignment method was not
taken at the demand of any *other* party in the desegregation consent decree lawsuits (Suppl. Br. 4, fn. 1)."

1   families.  A few parents were undecided because they were unsure whether it would be easier or

2   harder to improve underperforming schools or change the student-assignment system after the

3   decree expires.  Some students who spoke felt that the Dream Schools initiative had benefited

4   their schools, but that the consent decree focused too much on achieving diversity instead of

5   improving educational programs.

6                                              **ANALYSIS**

7           This action is the oldest case on the entire docket for the Northern District of California.

8   It has spanned more than one-tenth of our nation's existence.  It has lasted nearly as long as the

9   combined duration of all major wars against foreign powers by the United States since the

10  Revolutionary War.  The consent decree itself has lasted almost twice as long as the period of

11  Reconstruction following the Civil War.  The entire educational careers of many students were

12  spent under its regime with their own children under it yet.

13          Counsel proceed as if the question is simply whether the stipulated extension is fair,

14  reasonable and adequate under FRCP 23(e).  Even if that were the issue, the extension could not

15  be approved, for the public interest must also be considered.  *Waits v. Weller*, 653 F.2d 1288,

16  1291 (9th Cir. 1981).  The perpetuation of resegregation allowed, if not caused, by the decree

17  itself would be contrary to the public interest.  In effect, due to the *Ho* settlement and its bar on

18  revisions to the student-assignment system until the 2004–05 school year, the decree has

19  transformed itself into court-ordered resegregation.  This topsy-turvy outcome would remain

20  untouchable until October 2006 under the proposed extension.

21          But FRCP 23(e) is *not* the proper framework for analyzing the proposal.  This is not a

22  situation where the parties are "settling" a pending class dispute.  That happened two decades

23  ago.  Rather, we are at the very end of a previously-agreed transition period, with the consent

24  decree currently scheduled to expire in a few weeks.  Extending the consent decree now will

25  undo that deadline.

26          Any motion to modify or extend the consent decree was supposed to have been filed by

27  August 25, 2005.  No motion was filed.  Instead, counsel, perhaps accustomed to stipulations

28  rather than formal motions and expecting the Court to acquiesce, simply stipulated to modify the

United States District Court

For the Northern District of California

1   consent decree and extend federal court supervision another eighteen months.  Counsel in this

2   action have earned the Court's respect and admiration.  In part for that reason, the Court has

3   made the effort to explain at length herein why their compromise proposal and joint request for

4   extension are rejected.

5         The Court has repeatedly stressed that any modification or extension of the consent

6   decree must satisfy the *Dowell/Freeman* test, setting forth the standard for when termination of a

7   consent decree is appropriate.  Yet, SFNAACP, the *Ho* plaintiffs and the school district

8   collectively devoted less than four pages of their otherwise extensive briefs to conclusory

9   remarks regarding the application of *Dowell* and *Freeman*.  Only the State Superintendent's brief

10  contained any analysis under this standard.  Plainly put, counsel have failed to meet their burden.

11  They have failed to show that the vestiges of past *de jure* segregation, assuming that there was

12  ever any *de jure* segregation in the first place, have not already been eliminated.  And, they have

13  failed to cure the problem that the consent decree itself — through the student-assignment plan

14  with its so-called diversity index — is allowing, if not causing, racial resegregation.

15         **1.    THE CONSENT DECREE INCLUDES A SPECIFIC TERMINATION DATE.**

16         As a result of the 2001 settlement and subsequent modifications to the consent decree,

17  Paragraph 48-1 now provides:

18              The consent decree shall terminate as of December 31, 2005
                without the necessity of further order of the Court.  To facilitate an
19              orderly transition, the State shall continue its Consent Decree
                funding through the end of the SFUSD's 2005–06 school year on
20              June 30, 2006.  As the SFUSD shall have, by December 31, 2005,
                taken all practicable actions to achieve unitary status, including
21              eliminating any vestiges of past *de jure* racial or ethnic
                discrimination to the extent practicable and complying with the
22              Consent Decree substantially and in good faith for a reasonable
                period, the SFUSD and the State shall oppose any attempt to
23              extend, by motion or otherwise, the Consent Decree beyond
                December 31, 2005.
24
25         This language is notable.  *First*, it modified the 1999 settlement, so termination of the

26  consent decree was no longer "subject to court approval."  Significantly, *all* parties agreed to the

27  termination date.  *Second*, both the school district and the state agreed to oppose any attempt, *by

28  motion or otherwise*, to extend the consent decree beyond December 31, 2005.  (The

    San Francisco NAACP was the only party arguably permitted, and only by implication, to seek

                                              19

**United States District Court**
For the Northern District of California

1   extension of the consent decree by motion or otherwise, although it too had expressly agreed to

2   end the consent decree.)

3         Paragraph 48-1 specifically incorporated the *Dowell/Freeman* legal standard (addressed

4   below) for ending desegregation decrees and was premised on the expectation that the school

5   district would have met this standard by December 31, 2005.  The remaining provisions of the

6   consent decree provided a clear statement of the "practicable actions" the district needed to take

7   to achieve compliance and eliminate any vestiges of discrimination.  *See, e.g., Lee v. Butler*

8   *County Bd. of Educ.*, 183 F. Supp. 1359 (M.D. Ala. 2002) (terminating consent decree where

9   parties had agreed to updated consent decree detailing remedial steps to be taken within three

10  years and district had complied based on evidence presented to court).

11        The argument is now made that an eighteen-month extension is necessary for a smooth

12  and orderly transition away from federal court supervision.  This, however, was the rationale for

13  the extension adopted in 2001.  The consent decree was originally scheduled to terminate on

14  December 31, 2002, but it was extended to December 31, 2005.  Having chosen this date

15  themselves, the additional three years (and extra six months of state funding) was presumably

16  agreed by all parties to be sufficient for the transition.  In short, we have already been in

17  "transition" for almost three years.  This argument, standing alone, is not persuasive.

18      **2.**       **THE *DOWELL/FREEMAN* TEST.**

19        During the 1990s, the Supreme Court addressed the question of when termination of a

20  consent decree in the school-desegregation context is appropriate.  In *Dowell*, the school board

21  sought termination of a class-action desegregation decree that had been entered almost twenty

22  years prior upon a finding that the district had been operating an intentionally segregated school

23  system.  The Supreme Court remanded to the district court to determine whether the

24  desegregation decree should be terminated, stating a two-part test.

25        *First*, the district court was to determine whether the school district had complied in good

26  faith with the decree since it was entered.  *Second*, the court was to focus on whether the vestiges

27  of *de jure* discrimination had been eliminated "to the extent practicable."  To answer this latter

28  question, the district court was instructed to look to "every facet of school operations," including

faculty, staff, transportation, extra-curricular activities, facilities and student assignment. *Dowell*, 498 U.S. at 249–50; *see also Freeman*, 503 U.S. at 492 (1992) (adding "quality of education" to the list of factors).

In *Freeman*, the Supreme Court recognized that a desegregation decree may be terminated in incremental steps.  It held that "federal courts have the authority to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations."  Factors to be considered in ordering partial withdrawal of judicial control included:  "whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance."  This third factor could be demonstrated by a school district's record of compliance.  503 U.S. at 491.

There are literally hundreds of outstanding school-desegregation cases across the country.  Yet, judging by the number of published opinions in these cases over the past ten years, most are languishing on court dockets.  In those cases where the issue of terminating a desegregation decree has arisen, courts seem to overwhelmingly lean in favor of termination. *See* Wendy Parker, *The Decline of Judicial Decision-Making: School Desegregation and District Court Judges*, 81 N.C. L. Rev. 1623, 1639 (2003).

The *Dowell/Freeman* test requires a district court to examine not just process (compliance with the decree), but outcome (vestiges of *de jure* desegregation).  This involves a fact-specific analysis, including inquiries into student-assignment procedures, faculty and staff assignment, transportation, facilities, extracurricular activities and quality of education.  Here, the parties have expressly written into the consent decree that by December 31, 2005, the school district will have met this standard (CD IV ¶ 48-1).

United States District Court

For the Northern District of California

21

United States District Court

For the Northern District of California

1    The Supreme Court has not specifically defined what it means by "good faith

2   compliance" or what constitutes a "vestige" of discrimination.  District courts, by necessity, must

3   have discretion in deciding whether termination is warranted.  A recurring issue in these cases

4   boils down to a question of causation:  Are the current racial/ethnic disparities the result of past

5   intentional discrimination?  That is, are they "vestiges" of *de jure* discrimination?

6    Those circuit courts that have examined the issue have continued to leave the term

7   largely undefined and failed to find any instances of "vestiges" of discrimination.  *See*, *e.g.*,

8   *Coalition to Save Our Children v. State Bd. of Educ.*, 90 F.3d 752 (3rd Cir. 1996) (within-school

9   segregation in special-education and gifted/talented programs, decline in number of minority

10  teachers and racially-identifiable extra-curricular activities are not vestiges of past

11  discrimination); *Wessmann v. Gittens*, 160 F.3d 790 (1st Cir. 1998) (achievement gap between

12  black and Latino students versus white and Asian students, as well as lower teacher expectations

13  for black and Latino students, are not vestiges of past discrimination); *United States v. City of*

14  *Yonkers*, 181 F.3d 301 (2d Cir. 1999) (lower teacher expectations for minority students and lack

15  of updated curricula and teacher training are not vestiges of discrimination); *Belk v.*

16  *Charlotte-Menklenberg Bd. of Educ.*, 269 F.3d 305 (4th Cir. 2001) (racially-imbalanced schools,

17  less experienced teachers in minority schools and targeting of black students in student-

18  discipline practices are not vestiges of discrimination).

19    These decisions are in keeping with the Supreme Court's recognition that present-day

20  racial disparities may not be the result of past intentional discrimination.  In *Freeman*, the Court

21  excused segregated schools on the ground of purely private housing choices.  503 U.S. at 476,

22  490.  Likewise, in *Missouri v. Jenkins*, the Court found that racial disparities in achievement

23  scores could be due to "numerous factors beyond the control of [the district]."  515 U.S. 70, 101

24  (1995).

25    In the present case, when the *Ho* plaintiffs appealed the Court's denial of their

26  summary-judgment motion, the Ninth Circuit agreed that "vestiges" was the central issue.  The

27  opinion noted that "two issues remain for trial:  Do vestiges remain of the racism that justified

28  Paragraph 13 of the consent decree in 1983?  Is Paragraph 13 necessary to remove the vestiges if

they do remain?"  The Ninth Circuit made clear that "the 'vestiges' to be proved by it must be

tied to the discriminating practices and policies that justified the consent decree fifteen years

ago," and that "conclusory statements" are not sufficient evidence.  *Ho*, 147 F.3d at 865.  Given

the centrality of proving "vestiges" to the outcome of trial, the district court required the parties

to submit briefs arguing the appropriate definition of the term.  Ultimately, Judge Orrick adopted

the state's definition:

> [A] vestige of segregation or discrimination . . . exists when (1) there exists a current condition in the school system that is likely to convey the message of racial inferiority that is implicit in a policy of segregation; and (2) that current condition is caused, at least in part, by the intentional racially discriminatory policies and practices by government officials that justified the Consent Decree at its inception.

Because the *Ho* litigation settled, this standard was never actually applied.  But it seems to have

been the last word on the subject in our circuit.  *See* Ryan Tacorda, *Acknowledging Those*

*Stubborn Facts of History:  The Vestiges of Segregation*, 50 UCLA L. Rev. 1547, 1560 (2003).

Significantly, in its order approving the 1999 settlement, the Court acknowledged "the

difficult causation issue" and noted that "*[n]one of the parties to the litigation have been able*

*thus far to demonstrate that the current problems in the SFUSD have been caused by the prior*

*governmental discrimination that justified the adoption of the Consent Decree in 1983.*"

59 F. Supp. 2d 1021, 1038 (1999) (emphasis added).  The 2001 settlement extended the date for

termination of the consent decree from December 31, 2002, to December 31, 2005.  All parties

agreed that by December 31, 2005, the school district would have "taken all practicable actions

to achieve unitary status, including eliminating any vestiges of past *de jure* racial or ethnic

discrimination to the extent practicable and complying with the Consent Decree substantially and

in good faith for a reasonable period" (CD IV ¶ 48-1).  Proof to the contrary is not now before

the Court, as discussed in detail below.

### A.    Good-Faith Compliance.

The first prong of the *Dowell* test examines whether or not the district has complied in

good faith with the desegregation decree since it was entered.  District courts have a great deal of

discretion in determining "good faith compliance."  In 1997, when this Court denied the *Ho*

plaintiffs' summary-judgment motion, it cited the following areas of racial disparity where the

United States District Court

For the Northern District of California

1   district had failed to comply with the consent decree:  special-education classes, student

2   discipline, hiring and the achievement gap on standardized tests.  *Ho*, 965 F. Supp. at 1326–27.

3   Despite this evidence, there are also numerous examples of the district's good-faith efforts to

4   comply with the consent decree in more recent years.  For example, to address the achievement

5   gap and growing resegregation in the school district, the district began converting some of its

6   lowest-performing schools into "Dream Schools."  To address the disproportionate

7   representation of black students in special-education classes, the district has taken steps to

8   improve its referral and assessment system, including requiring each school to have a positive

9   behavior system in place (see Joint Response of All Parties to Issues Raised by Consent Decree

10  Monitor's Apr. 11, 2005 Suppl. Report).

11          Perhaps the best indication of the district's good-faith compliance with the consent

12  decree is that, since the 2001 settlement, no party has opposed any action taken by the school

13  district.  No one has filed a motion to enforce the consent decree or to hold the school district in

14  contempt for failing to comply.  Plaintiffs now belatedly assert that the school district has not yet

15  taken all practical steps to achieve unitary status.  Counsel argue that had such motions been

16  brought, they would have been granted.  This is not necessarily true.  Unsubstantiated

17  predictions of how the Court *might* have ruled on never-filed motions are insufficient to

18  demonstrate that the district has not complied in good faith with the consent decree.  This order

19  finds that the district has plainly tried to comply in good faith.

20                    **B.      Vestiges of Past *De Jure* Discrimination.**

21          The second prong of the *Dowell* test requires a court to examine whether the vestiges of

22  discrimination have been eliminated "to the extent practicable" in all areas of school operations,

23  including staff, transportation, extra-curricular activities, facilities, student assignment and

24  quality of education.  Undoubtedly, the San Francisco Unified School District is resegregated

25  today.  This segregation can be measured both across schools and within individual school

26  programs.  Segregation alone, however, does not provide a federal court with the legal authority

27  to continue enforcing a desegregation decree.  Unless the current segregation is a "vestige" of

28  past discrimination, a desegregation decree cannot be extended.

24

United States District Court

For the Northern District of California

The key question is whether the current segregation is the result of any past intentional racial discrimination by government officials.  *See Ho v. San Francisco Unified Sch. Dist.*, 147 F.3d 854, 865 (9th Cir. 1998); 59 F. Supp. 2d 1021, 1038 (N.D. Cal. 1999).  At no time in the entire twenty-seven-year history of this litigation has any party proven that the district was engaging or had ever engaged in intentional racial segregation.

Paragraph 8 of the original 1983 consent decree stated:

> The parties stipulate and agree that, if proof were presented in formal proceedings, the Court would be justified in making factual findings and legal conclusions sufficient to require the systemwide remedies that are set forth in this Consent Decree.

Stipulation aside, however, the Court's order noted that "no constitutional violations on [defendants'] part have been proved" and "[p]laintiffs' proof of discrimination, primarily against black students in the Western Addition, *circa* 1954 is weak in several respects."  *San Francisco NAACP*, 576 F.Supp. at 45–48.  Throughout the *Ho* litigation, the "vestiges" issue resurfaced.  Each time, this Court and the Ninth Circuit have pointed out the weak or nonexistent evidence linking current segregation to past intentional segregation.  *See Ho*, 147 F.3d at 865; *San Francisco NAACP*, 59 F. Supp. 2d at 1038.

In sum, nothing in the lengthy record of the related *SFNAACP* and *Ho* cases indicates that any current segregation is causally linked to intentional segregation that existed in 1983.  Nonetheless, it is worth examining some of the specific facets of school operations cited in *Dowell* for evidence of "vestiges" of past discrimination.

### (1)    *Student Assignment Across Schools.*

Assuming, *arguendo*, that the district did assign students to schools in an intentionally, racially discriminatory manner in the years preceding the original consent decree, it seems clear that the current segregation in San Francisco schools is not a "vestige" of this past discrimination.  As a result of the 1983 consent decree and the ethnic-distribution requirement it imposed on the district, San Francisco successfully desegregated its schools.  By 1997–98, only one district school enrolled more than fifty percent of a single race/ethnicity (*see* Biegel Report 16 (1998–99)).

United States District Court

For the Northern District of California

1    Significantly, it was the *Ho* settlement in 1999, (and subsequent modifications to the

2    consent decree), that prohibited the district from continuing to use race as a factor in student

3    assignment.  In the six years since then, the district has quickly become resegregated (*see* Biegel

4    Suppl. Report (April 2005) App. 1).  Thus, the current segregation across schools is not a vestige

5    of past discrimination, but rather a result of the evolution of the consent decree itself.  If

6    anything, the revised student-assignment plan imposed by the consent decree (with its so-called

7    diversity index) has been the main culprit.

8                    **(2)       *Student Assignment Within Schools:  Special Education.***

9            Whether the current segregation of students within schools — particularly in

10   special-education classes — is a vestige of past intentional discrimination presents a more

11   difficult question.  Discrimination in special education has been extensively litigated in

12   San Francisco.  In *Larry P. v. Riles*, black students challenged the process, especially the use of

13   I.Q. tests, used to place students in special classes for the educable mentally retarded.  The

14   district court held that the use of I.Q. tests which have a disparate impact on black students

15   violated the Rehabilitation Act, the Education for All Handicapped Children Act, Title VI and

16   the Fourteenth Amendment.  495 F. Supp. 926 (N.D. Cal. 1979).  The Ninth Circuit, however,

17   reversed the finding of intentional discrimination.  793 F.2d 969 (9th Cir. 1984).  *Larry P.*

18   supports a contention that the current segregation of special-education classes is related to the

19   long history of placement policies with a discriminatory impact on black students.  Yet, it fails to

20   prove that the district or state engaged in past intentional discrimination in this area.

21                    **(3)       *Faculty Hiring.***

22           It is in the area of faculty hiring that evidence of "vestiges" of past discrimination has

23   some conceivable traction.  In its 1983 order approving the consent decree, the Court noted that

24   in the area of faculty and administrative hiring and placement, "plaintiffs were factually strong

25   and likely to prevail at trial."  576 F. Supp. 34, 38–39.  The most recent report of the

26   consent-decree monitor reiterated that "the District has never come close to meeting the goals of

27   Paragraphs 34–35," namely that staff at each school would reflect the student population of the

28

entire school district (Biegel Report 22 App. 2 at 17).  The following chart demonstrates the current disparities (*see id.* at 17–18):

|  | % Certified Staff | % Teachers | % Administrators | % Student Population |
|---|---|---|---|---|
| Black | 6.4 | 5.2 | 15.4 | 13.7 |
| Latino | 9.5 | 9.4 | 12.1 | 21.6 |
| Filipino | 2.8 | 2.8 | 2.5 | 6.2 |
| Asian-American | 20.9 | 20.7 | 21.7 | 42.8 |
| White | 50.9 | 52.0 | 42.9 | 9.3 |

Because the disproportionate underrepresentation of minority teachers has been an ongoing pattern since 1983, plaintiffs conceivably could have succeeded, had they attempted to prove that current disparities among faculty are vestiges of past discrimination in this area.  But that link has not been proven on this record and the deadline for doing so has passed.  In sum, this order finds that the available evidence suggests that any vestiges of *de jure* discrimination have been eliminated to the extent practicable.

### C.     Importance of Local Control Over Schools.

In laying out the standard by which federal courts could extricate themselves from their role supervising desegregation decrees, the Supreme Court has emphasized the value of local control of schools.  In *Dowell*, Justice Rehnquist, writing for the majority, stated that injunctions in school-desegregation cases "are not intended to operate in perpetuity."  He continued:

> Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination."  498 U.S. at 247–48 (citation omitted).

The Supreme Court echoed this sentiment in *Freeman*, noting that accountability to the public remains even after court supervision ends.

> Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system.  When the school district and all state entities participating with it in operating the schools make decisions in the absence of judicial supervision, they can be held accountable to the citizenry, to the political process, and to the courts in the ordinary course.  503 U.S. at 490.

27

United States District Court

For the Northern District of California

1    The Supreme Court's continued emphasis on the value of local control over schools

2    militates in favor of terminating the decree in this case.  After twenty-two years of judicial

3    supervision and substantial compliance by the school district, it is entirely appropriate to return

4    full control of the district to the school board and superintendent.  These professionals are in the

5    best position to make educational policy decisions.  The normal political process should be

6    sufficient to hold the school district accountable.  San Francisco, it can be safely added, is a

7    beacon for human rights.  It would be one of the last places in America where racist school

8    policies would be expected.

9        **3.    THE *RUFO* STANDARD.**

10   In the alternative, *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), decided

11   one year after *Dowell*, established a two-part test for modifying consent decrees in

12   institutional-reform cases.  The party seeking modification "bears the burden of establishing that

13   a significant change in circumstances warrants revision of the decree."  If this burden is met, the

14   district court must consider "whether the proposed modification is suitably tailored to the

15   changed circumstance."  "Changed circumstances" include a significant change in factual

16   circumstances or in law.  If "changed factual conditions make compliance with the decree

17   substantially more onerous" or "a decree proves to be unworkable because of unforeseen

18   obstacles," modification may be appropriate.  However, "modification should not be granted

19   where a party relies upon events that actually were anticipated at the time it entered into a

20   decree."  The Supreme Court noted that its decision in *Rufo*, providing a more flexible standard

21   for relieving a party from a final decree than had previously been applied, was consistent with its

22   decision in *Dowell*, which provided a flexible standard for terminating a desegregation decree.

23   *Id.* at 383–85.

24   It is somewhat unclear whether the *Rufo* standard or the *Dowell/Freeman* standard should

25   be applied to a motion to extend (*i.e.*, modify the termination date of) a consent decree.  The

26   Ninth Circuit has not explicitly addressed this issue.  The Fourth Circuit, regarding a motion to

27   terminate a consent decree involving state welfare programs, has stated that "[t]he standards

28   employed in *Dowell* and *Rufo* are but variations on a single theme."  *Alexander v. Britt*, 89 F.3d

194, 197 (4th Cir. 1996).  The Sixth Circuit, on the other hand, has more explicitly stated that *Rufo* is the appropriate standard when deciding whether to modify a consent decree entered in a school-desegregation case.  *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1149 (6th Cir. 1992).  Likewise, the Eleventh Circuit, in a class-action employment-discrimination case, ordered the district court to apply the *Rufo* standard to modification motions and the *Dowell* standard to termination motions.  *United States v. City of Miami*, 2 F.3d 1497, 1503–09 (11th Cir. 1993).

Judge Orrick previously suggested that *Rufo* might be the applicable standard in his 1997 decision denying the *Ho* plaintiffs' motion for summary judgment.  965 F.Supp. at 1326 ("As plaintiffs by their motion seek to dissolve or terminate the entire Consent Decree rather than to modify it, the Court does not address at this time the propriety of modification under *Rufo v. Inmates of Suffolk County Jail*.").  Likewise, in its decision approving the 2001 settlement, Judge Orrick discussed the strength of the district's argument to extend the consent decree under the *Rufo* standard.  He referred to those "changed circumstances" that bolstered the district's case, including the resignation of the superintendent, the district's financial mismanagement troubles, unforeseen litigation and the change of lead counsel.  *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 2001 WL 1922333, *6.

It is true that after the proposal was tendered, Superintendent Ackerman announced her resignation effective June 30, 2006.  And, the teachers union has recently filed suit, challenging the school district's hiring practices for the new Dream Schools.  But these circumstances will not make compliance, at least for the few remaining months of the consent decree, "substantially more onerous" or "unworkable."  Indeed, Superintendent Ackerman's resignation is not effective until June 30, 2006, *after* the consent decree is currently scheduled to expire.  The *Rufo* standard for modifying a consent decree has not been met.

### 4.   THE STUDENT-ASSIGNMENT SYSTEM AND DREAM SCHOOLS.

The parties have failed to meet their burden of demonstrating that an extension of the consent decree is legally justified.  More than that, the Court is convinced that an extension will do more harm than good.  The current student-assignment system is not working, placing an

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    unnecessary burden on families in San Francisco.  Oddly, the proposed modification to the

2    decree would bar any adjustment to the student-assignment method before October 15, 2006.  In

3    essence, the school district would be forced to continue using the diversity index for the 2006–07

4    school year and possibly beyond.

5          The current student-assignment system based on the diversity index has not only failed to

6    accomplish its desired purpose, but has in fact allowed, if not caused, resegregation of the school

7    district.  At the hearing, counsel for SFNAACP claimed that the diversity index itself was not

8    responsible for the resegregation of underperforming schools because it only affected student

9    assignment at over-subscribed (*i.e.*, more desirable), not under-subscribed (*i.e.*, less desirable),

10   schools.  This argument fails to explain why the original consent decree was so successful in

11   producing racially integrated schools, but the current system is failing.  It would be wrong to

12   compel the continued use of a flawed student-assignment system, one that at best is a vain

13   exercise and at worst actually promotes racial segregation.  It is no answer to say that more

14   studies will be done in the future.  This Court has pleaded with the parties to fix the diversity

15   index.  They have not.  This order declines to perpetuate a flawed, court-ordered

16   student-assignment system.

17                          *        *        *

18         The Dream Schools initiative may be an important step towards closing the achievement

19   gap.  Improving academically underperforming schools may even indirectly help achieve

20   diversity, by making those schools more attractive to children of all racial/ethnic groups.  The

21   school district is prepared to go forward with its plans for Dream Schools with or without an

22   extension of the consent decree.

23         This order stresses that the Dream Schools initiative was an idea that began with the

24   school district itself.  It was subsequently incorporated into the decree in mid-2004 via a

25   stipulated amendment that made the initiative mandatory under the decree.  The Court routinely

26   approved the stipulation without a hearing.  In hindsight, perhaps this was unwise.  At least one

27   effect of writing the initiative into the decree was to strengthen the hand of the district against

28   teachers, parents and others not joined in this litigation.  When the teachers union (and others)

United States District Court

For the Northern District of California

1    later complained over the details of implementation, the district answered that the Dream

2    Schools were compulsory under the decree.  Litigation in state court over the displacement of

3    teachers at newly-converted Dream Schools, for example, was removed to federal court by the

4    school district.  Similarly, when a family sued in state court over their son's assignment to a

5    particular school, the district removed the case to this Court on the grounds that the lawsuit

6    challenged the consent decree.  *Johnson v. San Francisco Unified Sch. Dist.*, No. C 05-00245

7    WHA (N.D. Cal. removed Jan. 18, 2005).

8            Once the initiative was built into the decree, the Court felt obliged to monitor its

9    implementation.  Regular hearings were held.  The school district was required to meet various

10   self-imposed deadlines, each of which was jointly requested by stipulation.  The school district,

11   however, fell further and further behind its own schedule.  It frantically tried to ready the Dream

12   Schools in time for the annual parent-student selection process.  The result:  When the parents

13   were called upon to make their decisions, many teachers and many courses were not yet in place

14   at the designated Dream Schools.  Family decisions had to be based on vague, skeletal themes.

15   Moreover, the teachers union claims that the teacher-selection process was too compressed.

16   Wildly erratic hiring led to unfair replacement of many experienced teachers, it claims.  Perhaps

17   if the Dream Schools had not been incorporated as part of a mandatory decree, the district might

18   have done a better job by focusing its energies on converting one school at a time.

19           The Court now finds itself being blamed for the district's rushed implementation of the

20   initiative.  Despite the multiple hearings and intermediate deadlines established to effect the

21   Dream Schools, it is clear that no federal judge is as well-equipped as school professionals to

22   make the educational policy decisions involved.  Now, counsel wish to do it again and build yet

23   more mandatory Dream Schools into the decree (while locking in the same discredited

24   student-assignment system for another year).

25           The decree has drifted too far.  The modus operandi for this case has evolved to this:

26   Counsel broker a deal for their clients.  Then they write it into the decree.  Then they use the

27   supremacy of the decree to override any opposition from parents, teachers and other interests not

28   represented in this suit.  The checks and balances of the traditional governmental and political

31

United States District Court

For the Northern District of California

1   processes are thus short-circuited.  Counsel and their clients have become a kind of supreme

2   council able to fast-track educational initiatives of their own choosing and to bypass concerns of

3   those unrepresented herein.  This would be acceptable were it remedying the vestiges of past

4   *de jure* segregation.  But that is not so.  Instead, the rationale for the initiatives has drifted to

5   doing "what is best" for the children of San Francisco.  Excellent as it sounds, this rhetoric has

6   no anchor in the original source of the district court's power to intrude upon local government.

7   What is best for the children of San Francisco should be left to the professionals in the district,

8   subject to the voices of all in the community, whether or not they have a seat at counsel table.

9       In short, since the settlement of the *Ho* litigation, the consent decree has proven to be

10  ineffective, if not counterproductive, in achieving diversity in San Francisco public schools.

11  *De jure* segregation has never been proven, much less vestiges thereof.  As the decree has come

12  to be used, the Court must pretend to supervise decisions better left in the hands of education

13  professionals subject to the rough and tumble of local politics and government.  "Returning

14  schools to the control of local authorities at the earliest practicable date is essential to restore

15  their true accountability in our governmental system."  *Freeman*, 503 U.S. at 490.  The time has

16  come to do so for San Francisco.

                                    **CONCLUSION**

18      For the foregoing reasons, the extension of the consent decree is **DENIED**.  As previously

19  stipulated, the consent decree shall expire on December 31, 2005.


21      **IT IS SO ORDERED.**


23  Dated:  November 8, 2005.

                                    _____
24                                  WILLIAM ALSUP
                                    UNITED STATES DISTRICT JUDGE